## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DAWN HOCH, | : | CIVIL ACTION |
|  | : | |
| Plaintiff, | : | |
|  | : | |
| v. | : | No. 08-4805 |
|  | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY, | : | |
|  | : | |
| Defendant. | : | |

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **APRIL 29, 2009**

Presently before the Court are Cross-Motions for Summary Judgment filed by Plaintiff Dawn Hoch ("Hoch") and Defendant Hartford Life and Accident Insurance Company ("Hartford").  For the following reasons, Hartford's Motion is granted, and Hoch's Motion is denied.

**I.      FACTS**

**A.      Hoch's Employment and Hartford's Policy**

Hoch worked as a parts counterperson at Sloane Automotive Group ("Sloane") from November 16, 1998 to July 11, 2005.  (Pl.'s Mem. Supp. Mot. Summ. J. at 2.)  Hoch participated in the Group Benefit Plan for Sloane, which provided long-term disability ("LTD") benefits to eligible and qualified employees insured by Group Policy No. GLT-703432 ("Policy"). (Hartford's Administrative Record ("R.") at 650.)  The Policy is insured by, administrated by and funded by Hartford.  (Def.'s Ans. ¶ 6.)  Coverage under the Policy provides a benefit plan of

sixty percent of an employee's monthly base compensation in the event of total disability.  (Id.)

The Policy provides benefits to an eligible participant who is prevented by certain enumerated

conditions "from performing one or more of the Essential Duties of Your Occupation, and as a

result your Current Monthly Earnings are no more than eighty percent of your Indexed Pre-

disability Earnings" ("Own Occupation standard" or "Own Occupation period").  (R. at 662.)

After the Own Occupation period, a person "must be so prevented from performing one or more

of the Essential Duties of Any Occupation" to remain eligible to receive benefits ("Any

Occupation standard").  (Id.)  The Policy further provides that Hartford has "full discretion and

authority to determine eligibility for benefits and to construe and interpret all terms and

provisions of the Group Insurance Policy."[1]  (Id. at 661.)

**B.      Hoch is Injured and Receives Long-Term Disability Benefits**

        Hoch claims that, as early as 2004, she began experiencing "sporadic onsets of dizziness

and imbalance" but initially continued to work despite such onsets.  (Pl.'s Mem. Supp. Mot.

Summ. J. at 2.)  On June 2, 2005, Hoch fell when exiting a store, landing on her right knee, back

and neck.  (Id.)  As a result of the fall, Hoch claims she fractured her right foot, injured her right

knee, and suffered cervical disc protrusions, migraine headaches, worsening of pre-existing

lumbosacral pain and a severe exacerbation of her pre-existing dizziness and balance problems.

(Id.)  As a result of these injuries and the exacerbation of her dizziness and balance problems,

Hoch claims that she was unable to continue working at Sloane.  (Id.)

        Hoch applied for and received short-term disability ("STD") benefits as the result of pain

---

[1] The parties agree that Hoch presented sufficient evidence to entitle her to receive benefits under the Own
Occupation standard.

and swelling in her foot.  (R. at 629.)

On July 11, 2005, Dr. Charles Odgers ("Dr. Odgers") completed an Attending Physician's Statement ("APS") in support of Hoch's STD application, indicating that Hoch's diagnosis was a right talus avulsion fracture.[2]  (Id. at 628.)  On September 21, 2005, Hoch visited Dr. Thomas H. Graham ("Dr. Graham") of Graham Neurological Associates, complaining of a depth perception problem.  (Id. at 1312.)  Dr. Graham noted that Hoch's symptoms were developing the quality of agoraphobia,[3] for which he was not inclined to treat her.  (Id.)  He decided to stop testing Hoch and to re-evaluate her in six months.  (Id.)  He encouraged her to start adjusting her lifestyle to deal with her sense of altered depth perception.  (Id.)

On September 26, 2005, Dr. Odgers completed another APS for Hoch, which indicated that she continued to suffer from a right ankle talus fracture and cervical thoracic pain.  (Id. at 613-14.)  On October 18, 2005, Hoch visited Dr. Michael Lee ("Dr. Lee"), a physical medicine and rehabilitation specialist, and received an epidural steroid injection for cervical back problems.  (Id. at 586.)  On October 19, 2005, Hoch visited Dr. David A. Bernstein ("Dr. Bernstein"), a podiatrist, complaining of pain in her right foot.  Dr. Bernstein examined Hoch, but found no areas of tenderness, that her range of motion was pain free without crepitus,[4] and that her neurovascular status was within normal limits.  Dr. Bernstein explained that, without any areas of tenderness, swelling or other abnormalities, he could not offer her much of a diagnosis.

---

[2] Talus avulsion- the ripping or tearing away of the ankle bone from the tibia.  Dorland's Illustrated Medical Dictionary, at 166, 1658 (28th ed. 1994) ("Dorland's").

[3] Agoraphobia- "intense, irrational fear of open spaces, characterized by marked fear of being alone or being in public places where escape would be difficult or help might be unavailable."  Dorland's at 38.

[4] Crepitus- "the crackling sound produced by the rubbing together of fragments of fractured bone" or "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints."  Dorland's at 391.

(Id. at 1264.)

On November 21, 2005, Hoch completed an application for LTD benefits, asserting that her problems with her back and foot rendered her disabled. (Id. at 599-602.) On January 16, 2006, Hartford wrote to Hoch informing her that it had approved her LTD benefits under the Own Occupation standard. (Id. at 453-56.)

**C.      Hoch Continues Treatment and Receives Social Security Benefits**

On January 18, 2006, Hoch visited Dr. Robert Lawlor ("Dr. Lawlor"), Hoch's family doctor, and complained to him that she had been experiencing a chronic dizzy feeling for the last four years. (Id. at 1318.)

On February 16, 2006, the Social Security Administration ("SSA") denied Hoch Social Security Disability ("SSD") benefits. (Id. at 422-26.) Hoch subsequently requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at 410.) On August 24, 2006, an ALJ held that Hoch had been under a "disability" as defined by the Social Security Act since July 11, 2005, and that she was entitled to SSD benefits. (Id. at 934-40.)

On March 19, 2006, Hoch visited Dr. Bernstein, who concluded that she had bursitis[5] for which she received a cortisone injection. (Id. at 1259.) The following week, Hoch visited Dr. Graham, who noted a possible defect in her left eye with a tendency for left exophoria,[6] some facial pressure and a new stress fracture in her left foot. (Id. at 1261.) Dr. Graham observed no other new problems on examination, but Hoch reported degenerative disc disease in her cervical

---

[5] Bursitis- inflammation of a bursa, "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." Dorland's at 238, 240.

[6] Exophoria- a form of heterophoria ("failure of the visual axes to remain parallel after the visual fusional stimuli have been eliminated") in which there is "deviation of the visual axis of one eye away from that of the other eye in the absence of visual fusional stimuli." Dorland's at 592, 763.

4

spine.  (Id.)  She also continued to have amblyopia[7] and migraine complaints, as well as neck

pain which was being addressed by another doctor.  (Id.)  Dr. Graham noted that the exact nature

of Hoch's complaints was unclear.  (Id.)  Dr. Graham and Hoch decided that she would follow-

up with Dr. Lawlor for her hypertension issue and would return to Dr. Graham only if her

migraines worsened, or if she experienced new neurologic episodes.  (Id. at 1260.)

On April 11, 2006, Hoch underwent a bone scan of her feet which showed signs

consistent with a stress fracture of her left foot and a healing stress fracture in her right foot.  (Id.

at 1263.)  On July 10, 2006, Hoch visited Dr. M. Anjum Irfan ("Dr. Irfan"), a psychiatrist, for a

psychiatric evaluation.  Dr. Irfan concluded that Hoch suffered from bipolar mood disorder and

sought to rule out Post Traumatic Stress Disorder ("PTSD") as a possible diagnosis.  (Id. at

1344.)

On September 21, 2006, Hoch completed a Claimant Questionnaire for Hartford,

claiming that she experienced severe pain in her left foot when she walked for more than five

minutes and that she continued to have intermittent pain three to four days a week in her neck.

(Id. at 1360.)  Hoch further indicated that she could not bend down much or carry or pick up her

grandchildren without severe pain in her neck, back and foot after three to four minutes.  (Id.)

**D.     Hartford Conducts Surveillance of Hoch**

On October 2, 3, 25 and 26, 2006, Hartford performed video surveillance of Hoch.  (Id. at

1471-78.)  On October 2, Hoch was observed walking her dog.  On October 3, Hoch was

observed ascending and descending steps, leaning right and left, tilting her head, flinging her hair

to the side, holding a conversation for more than fifteen minutes while gesturing with her hands,

---

[7] Amblyopia- "impairment of vision without detectable organic lesion of the eye."  Dorland's at 53.

5

tossing an object onto the lawn, carrying two large cardboard boxes, walking her dog and driving, all in a normal, unrestricted fashion without aides or braces.  (Id. at 1472-74.)  On October 26, Hoch was seen driving with a dog and a young child later determined to be her grandchild, carrying the dog, bending over to speak with the child, and entering a department store with two young children and remaining there for twenty minutes, again all in a normal, unrestricted fashion.  (Id. at 1476-78.)  Hoch was not observed during the attempted surveillance on October 25.  (Id. at 1475-76.)  Hartford forwarded this surveillance video to Drs. Lee, Lawlor and Irfan, asking that they review the video and indicate whether they agreed that Hoch was capable of light level physical demand work.  Dr. Lee agreed that Hoch was capable of such work, Dr. Lawlor disagreed and Dr. Irfan did not respond.  (Id. at 1484.)

**E.      Hoch is Diagnosed with Chronic Subjective Dizziness**

On January 26, 2007, Dr. Michael J. Ruckenstein ("Dr. Ruckenstein"), a neurologist at the University of Pennsylvania Balance Center, referred Hoch to an audiologist for a Balance Function Evaluation.  (Id. at 1184.)  The results of Hoch's audiogram and balance function tests were normal.  (Id. at 1184-85.)  On March 5, 2007, Dr. Ruckenstein then conducted a full otologic review of Hoch and concluded that although there was no physical basis for her complaints, Hoch had Chronic Subjective Dizziness ("CSD"), a condition "most typically associated with chronic anxiety disorder with superimposed panic and/or phobic attacks."  (Id. at 1186.)  Dr. Ruckenstein believed, however, that in Hoch's case, there "may be more profound psychopathology present."  (Id.)  Dr. Ruckenstein then referred Hoch to Dr. Jeffrey P. Staab ("Dr. Staab"), a psychiatrist, also of the University of Pennsylvania Balance Center.

6

**F.    Hartford Conducts its First Independent Medical Record Review of Hoch**

On March 27, 2007, Hartford conducted an Independent Medical Record ("IMR") review, requesting that Dr. Marie-Claude Rigaud ("Dr. Rigaud"), a psychiatrist, review Hoch's file from a psychological perspective, and that Dr. Arousiak Varpretian ("Dr. Varpetian"), a neurologist, review Hoch's file from a physical perspective.  (Id. at 1509; 1240-43.)  On April 16, 2007, Dr. Rigaud reported to Hartford after reviewing Hoch's record and Hartford's surveillance, and summarized the various diagnoses Hoch had received since she began seeking disability benefits.[8]  (Id. at 1500.)  Dr. Rigaud found "no evidence to support that [Hoch] cannot be out of the home, interacting with others or engaging in typical activities of daily living related to her mental health."  (Id. at 1502.)  She concluded that the documentation related to Hoch's psychiatric condition and Hoch's observed activities on the surveillance video:

> did not provide evidence of limitations in [Hoch's] capacity to stand [or] walk for a prolonged period of time based on depressive symptoms, lack of stamina or endurance. . . . Based on all the information reviewed, it is this reviewer's opinion that there is no psychiatric rationale to assign specific restrictions or limitations to [Hoch's] daily activities.

(Id. at 1501-02.)  Dr. Rigaud further found that there was no "objective clinical evidence of serious psychiatric symptoms or behaviors. . . . Objective findings of mental status were limited to pressured speech and the psychiatrist assessed at some point that the claimant was 'stable but symptomatic.'"  (Id. at 1503.)  Accordingly, Dr. Rigaud "found no objective evidence to support severe psychiatric functional limitations that would prevent [Hoch] from working."  (Id.)

_____

[8] Dr. Rigaud also spoke with Dr. Lawlor, but not until April 18, 2007.  (Id. at 1507.)  Dr. Lawlor reported that he did not have a psychiatric diagnosis for Hoch, but he understood she had a history of bipolar disorder.  (Id.)  Dr. Lawlor, however, had not seen any signs of that condition and was not aware that a psychiatric condition disabled her.  (Id.)  He was aware that Dr. Ruckenstein had diagnosed her with CSD, a condition Dr. Lawlor understood to be associated with anxiety and panic or phobic attacks.  (Id.)

Dr. Varpetian also reported to Hartford on April 16, 2007, after reviewing Hoch's record and Hartford's surveillance.  (Id.)  Dr. Varpetian was able to discuss Hoch's condition with Dr. Lawlor.[9]  Dr. Lawlor informed Dr. Varpetian that "according to Ms. Hoch, the reason she can't work is dizziness.  The diagnosis has been 'elusive' until she was seen by a neuro-otologist and diagnosed with 'chronic subjective dizziness' . . . ."  (Id. at 1504.)  Dr. Varpetian concluded that there was "no evidence of balance deficit or any other physical barrier to a full time occupation."  (Id. at 1505.)  He further found that there was no documentation or observable behavior to support the assertion that Hoch lacked the physical functional capacity to lift or carry up to twenty pounds occasionally or ten pounds frequently, nor was there medical or video support for the finding that Hoch could not move her cervical spine in a normal manner to enable her to engage in the routine activities of daily living.  (Id.)  Dr. Varpetian therefore saw no medical reason that Hoch could not sit for prolonged periods during an eight hour work day if she were permitted to alternate sitting with periods of standing, walking or stretching.  (Id. at 1506.)

**G.     Hartford First Terminates Hoch's Benefits; Hoch Continues Treatment**

On May 14, 2007, Hartford terminated Hoch's LTD benefits, concluding that, as of May 5, 2007, Hoch no longer met the policy definition of "disabled," which was defined as an inability to perform "one or more Essential Duties of Your Occupation" (i.e., as a parts counterperson).  (Id. at 51-55.)  Hartford primarily based its decision to terminate Hoch's LTD benefits on its video surveillance and the record reviews by Drs. Rigaud and Varpetian.  (Id. at 53-55.)

---

[9] Dr. Varpetian also attempted to contact Dr. Irfan on numerous occasions, but Dr. Irfan did not return his calls.  (R. at 1504.)

8

Following Hartford's termination of Hoch's benefits, Hoch visited Dr. Staab on May 16, 2007.  During this visit, Dr. Staab noted that Hoch complained of:

> a sudden onset of unsteadiness 7-8 years ago.  Initially, it happened a few times sporadically, but gradually increased in frequency and duration.  Now occurs most days with a rapid onset of unsteadiness without warning.  Some episodes last for a few seconds, others persist for days or weeks.  When standing still or sitting still, she has an illusion of falling into the ground.  Nearly housebound.  Goes out only with someone else.  Walks with a cane, walker, or holding onto something.  Otherwise she inches forward, fearful of falling.  No true vertigo.  Only one fall near onset of her illness.

(Id. at 1189.)  Dr. Staab diagnosed Hoch as having vestibular migraines with CSD, agoraphobia without panic attacks and "[d]epressive disorder NOS (subthreshold depression)."  (Id. at 1192.) Hoch followed up with Dr. Staab on July 18, 2007.  (Id. at 991.)  Dr. Staab noted that "her depression decreased a bit, but her motor sensitivity did not change."  (Id.)  On August 29, 2007, Dr. Staab saw Hoch again and noted no clear change in her symptoms.  (Id. at 1189-90.)

## H.    Hoch Appeals Hartford's Decision; Hartford Conducts a Second IMR Review

In a letter dated October 26, 2007, Hoch's counsel appealed Hartford's decision to terminate Hoch's LTD benefits.  (Id. at 989.)  Hoch asserted that it was her CSD, coupled with anxiety and depression, that precluded her from working.  (Id. at 990.)  Hoch also submitted additional medical records from Dr. Staab, as well as Drs. Ruckenstein and Lawlor.  (Id. at 990-92; 994-95.)  Hartford subsequently referred Hoch's claim, including all newly submitted information, as well as all of the documentation previously contained in Hoch's file, to Dr. Janet Jankowiak ("Dr. Jankowiak"), a neurologist, and Dr. Melvyn Lurie ("Dr. Lurie"), a psychiatrist, for a second IMR review.  (Id. at 978-79.)

Sometime in November 2007, Hoch visited Dr. Lawlor for a preoperative evaluation for

bunion surgery.  (Id. at 1118.)  However, Dr. Lawlor claims that Hoch did not discuss her

dizziness with him during this visit.  (Id.)

On January 18, 2008, Dr. Lurie reported his findings to Hartford after reviewing the

record.  He stated that the record "did nothing to suggest that Hoch was without severe disability

and only suggested that her CSD was not psychiatric in nature but neurologic."  Dr. Lurie

concluded that Hoch had no significant psychiatric impairment, and assumed Hoch's problem

must be physical in nature if she had one.  (Id. at 1217.)  In his psychiatric IMR review report of

Hoch's condition, Dr. Lurie discussed Hoch's history of psychological diagnoses.  (Id. at 1202-

05.)  Dr. Lurie also discussed Hoch's condition with Dr. Staab who reported that, during his

visits with Hoch, she reported daily dizziness, driven by vestibular migraines and agoraphobia.

Dr. Staab explained to Dr. Lurie that he would not advise Hoch to return to work because he

believed she needed a job that allowed bathroom breaks for about fifteen minutes every hour.

(Id. at 1211.)  However, he did not believe her use of prescription medication affected her

functioning.  (Id.)  After speaking with Drs. Staab and Jankowiak and reviewing Hoch's file, Dr.

Lurie concluded that Hoch's psychiatric conditions were mild and not functionally limiting.  (Id.

at 1208.)  Dr. Lurie believed that Hoch could possibly be suffering from a somatoform disorder,[10]

which could be potentially limiting from a psychiatric standpoint, but a physical medicine doctor

would have to make a determination as to the degree of functional limitation.  (Id.)  Dr. Lurie

further concluded that there was no evidence that Hoch's use of prescription medications limited

her.  (Id. at 1209.)

_____

[10] Somatoform Disorder- a mental disorder "characterized by symptoms suggesting a physical disorder that
are not of psychogenic origin but not under voluntary control . . . ."  Dorland's at 495.

Dr. Jankowiak also reported her findings to Hartford on January 18, 2008.  (Id. at 1114.)

Dr. Jankowiak noted Hoch's diagnoses of CSD, back and neck pain, headaches, anxiety and

panic phobias.  (Id.)  As part of her review, in addition to inspecting all of the documentation in

Hoch's file and the surveillance video, Dr. Jankowiak spoke with Drs. Lawlor, Ruckenstein and

Lurie.  (Id. at 1114-20.)  Dr. Ruckenstein told Dr. Jankowiak that he had only seen Hoch one

time and, while he could not specifically remember her, his note indicated a profound

psychopathology and CSD.  (Id. at 1117.)  Dr. Ruckenstein stated that, because he believed Hoch

fit into a subgroup of patients with CSD who often did not respond well to treatment due to a

more severe psychopathology, he referred Hoch to Dr. Staab for a psychiatric evaluation.  (Id. at

1117-18.)  Dr. Jankowiak also spoke with Dr. Lawlor, who advised her that Hoch's "unusual

problem" was finally diagnosed as CSD, and her symptoms included sudden and unpredictable

bouts of severe dizziness with falls.  (Id. at 1118.)  Dr. Lawlor stated that he had seen Hoch in

November 2007, and she last complained of dizziness during her March 23, 2007 visit.  He did

not know if she was continuing to suffer from that symptom.  (Id.)  He also did not know if she

continued to take medications for depression, but he did not believe that she was depressed at the

time he saw her, nor did he think she had any other behavioral or mood disorder.  (Id.)  Dr.

Lawlor indicated that Hoch's medical problems at the time he saw her were hypertension,

hyperlipidemia[11] and congenital blindness in the left eye.  (Id.)  Dr. Lawlor stated that he did not

believe Hoch should work or drive as long as her CSD was unresolved, but also stated that he did

not think Hoch had any other problems that precluded her from working if her CSD was

---

[11] Hyperlipidemia- "a general term for elevated concentrations of any or all of the lipids in the plasma . . . ." Dorland's at 795.

11

resolved.  (Id.)  Dr. Jankowiak also confirmed that Hoch underwent a number of diagnostic

studies, but they were all "relatively unremarkable."  (Id.)

Dr. Jankowiak discussed with Dr. Lurie the fact that Hoch's records had no clear

synthesis of complaints or physical findings.  (Id. at 1119.)  Dr. Jankowiak stated that he had "no

clear picture of how often these spells may occur," nor could he "ascertain how much functional

impact they may have."  (Id. at 1124.)  Dr. Jankowiak concluded, however, that Hoch did not

seem to have any significant neurological impairment that would hinder her functioning.  (Id. at

1119.)  Dr. Jankowiak concluded that Hoch could perform full-time sedentary level work, but

should avoid heights, dangerous equipment, heavy machinery and driving, but she could take

public transportation.  (Id. at 1124-25.)  She further concluded that Hoch's medications did not

pose any need for additional restrictions.  (Id. at 1125.)

**I.      Hartford Reinstates Benefits, Assesses Employability; Hoch Continues Treatment**

On January 25, 2008, Hartford reinstated Hoch's benefits retroactive to May 5, 2007.  (Id.

at 1043.)  Hartford claims it made this decision because, "among other reasons, Dr. Jankowiak

concluded that [Hoch] was capable of sedentary level work, but [Hoch's] occupation as a parts

counterperson was classified as light level work."  (Def.'s Mem. Supp. Mot. Summ. J. at 11.)

Hartford then began investigating whether Hoch was entitled to benefits under the "Any

Occupation" standard.  (R. at 1037.)

Hartford referred Hoch's claim to Chris Fleisher, MS, CRC ("Fleisher"), Hartford's

rehabilitation Clinical Case Manager, to perform an Assessment of Employability (the

"Assessment").  The Assessment was designed to determine whether there were any occupations

within the national economy that Hoch could perform based upon the conclusions that Hoch

could perform full-time sedentary work with no climbing or driving, and provided that she had the flexibility to take fifteen minute breaks every hour per Dr. Staab's recommendation. (Id. at 1092.) Fleisher used the Occupation Access System ("OASYS"), which is a computer program that cross references an individual's qualification profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles. (Id.) The Assessment was based upon Hoch's functional capabilities, training, education and work history. (Id.) The Assessment identified at least seven occupations within the national economy that required skills or traits which Hoch possessed and which were within her physical, mental and cognitive abilities. (Id. at 1093-94.) Each of the jobs also met the required wage earnings under the Policy. (Id. at 1094.)

In March 2008, Dr. Keira Chism ("Dr. Chism"), of the University of Pennsylvania Balance Center, began treating Hoch for CSD. (Pl.'s Mem. Supp. Mot. Summ. J. at 6.) Dr. Chism continued to treat Hoch until August 2008, when Hoch began seeking treatment from Dr. Margot O'Donnell ("Dr. O'Donnell"), also of the University of Pennsylvania Balance Center. (Id.)

## J.    Hartford Again Terminates Hoch's Benefits

On April 2, 2008, Hartford advised Hoch that it had completed its review of her claim under the "Any Occupation" standard and had determined that after March 31, 2008, she failed to meet the Policy definition of "disability" because she was not precluded from performing the essential duties of any occupation. (Id. at 1171.) Hartford stated that the medical evidence showed that Hoch could sit up to eight hours per day with ten to fifteen minute breaks every hour, that she could talk, hear, taste, smell, handle, finger and feel constantly, lift or carry up to

13

ten pounds frequently, and stand or walk occasionally.  (Id. at 1175.)  Hartford stated that, using

that information, its Assessment identified various occupations which Hoch could perform given

her physical capabilities and the required earnings under the Policy.  (Id. at 1176.)  Therefore,

Hartford concluded that Hoch was not prevented from performing the essential duties of any

occupation after March 31, 2008.  (Id.)

**K.**      **Hoch Appeals Hartford's Decision; Hartford Conducts a Third IMR Review**

Hoch's counsel appealed Hartford's decision in a letter dated July 2, 2008.  (Id. at 784-

87.)  The appeal letter argued again that Hoch was prevented from working by CSD, coupled

with related anxiety and depression.  (Id. at 786.)  Hartford subsequently referred Hoch's file to

Dr. Maureen E. Smith ("Dr. Smith"), a psychiatrist, and Dr. Randall B. King ("Dr. King"), a

neurologist, for a third IMR review.  (Id. at 766.)

On September 2, 2008, Dr. Smith reported her findings to Hartford.  (Id. at 735.)  Dr.

Smith, who reviewed Hoch's records from a psychiatric perspective, noted that Dr. Staab had

originally indicated that Hoch's self-reported symptoms precluded even sedentary level

employment because of her motion sensitivity.[12]  (Id. at 736.)  Dr. Smith noted that "Dr. Staab

maintained (according to Dr. Lurie's letter) that the diagnosis of CSD is a neurological diagnoses

that does not 'translate into a DSM IV (psychiatric) diagnosis.'"  (Id.)  Dr. Smith then noted that

"Dr. Ruckenstein opined (according to Dr. Jankowiak) that CSD is a psychological disorder

associated with chronic anxiety and panic disorder."  (Id.)  Dr. Smith subsequently concluded

that Dr. Staab's understanding of Hoch's problem was inaccurate.  (Id. at 740.)  While Dr. Staab

---

[12] According to Dr. Lurie's letter dated January 18, 2008, Dr. Staab stated that his employment restrictions
were based on his opinion that Hoch would need to take frequent breaks.  (Id. at 1211.)

assumed Hoch's symptoms were neurological, Dr. Ruckenstein, who was an expert in the

physiologic basis for CSD, had clarified there was no physical cause for Hoch's CSD.  (Id.)  Dr.

Ruckenstein's conclusion was also consistent with Dr. Graham's observations.  (Id.)  Dr. Smith

noted, however, that there was evidence that Hoch had "serious symptoms of a mental emotional

nature in the notes provided by Dr. Irfan . . . ."  (Id.)  Nevertheless, Dr. Smith opined that any

person who was actually experiencing the symptoms claimed by Hoch, such as a disabling

unremitting dizziness, would be motivated to seek more intensive treatment than Hoch had ever

sought.  (Id. at 743.)  Dr. Smith went on to explain that motivational factors may well explain

Hoch's "different presentations to different providers and the apparent contrast with evidence of

her functionality seen in the video."  (Id.)  Although she found that Hoch's condition had a

psychiatric basis, Dr. Smith concluded it was not to the point of disabling, stating:

> In summary, based on my review of the information provided, it is my opinion
> that [Hoch's] complaints of chronic subjective dizziness are co-morbid [with] the
> presence of mental/emotion symptoms.  From the diagnostic point of view, the
> differential includes Undifferentiated Somatoform Disorder, Factitious Disorder[13]
> and Malingering[14]. . . . [T]he chief barrier to [Hoch's] functionality in the
> workplace is motivational.  There is nothing inherent in [Hoch's] presentation
> from a Psychiatric point of view that would preclude her functioning in the
> workplace if she were motivated to do so.  In fact, work activity would very likely
> benefit her overall condition. . . . In my opinion, there is no support for functional
> limitations due to a mental/emotional disorder.

(Id. at 743.)

Dr. King, who reviewed Hoch's claim from a physical perspective, also reported his

findings to Hartford on September 2, 2008.  (Id. at 728.)  Dr. King spoke with Dr. Lawlor, who

---

[13] Factitious Disorder- "a mental disorder characterized by repeated, knowing simulation of physical and psychological symptoms for no apparent purpose other than obtaining treatment."  Dorland's at 494.

[14] Malingering- "the willful, deliberate, and fraudulent feigning or exaggerating of the symptoms of illness or injury, done for the purpose of a consciously desired end."  Dorland's at 982.

offered no opinion on Hoch's functional limitations or her work capacity at that time.  (Id. at 731.)  Dr. King agreed with Dr. Ruckenstein that Hoch had CSD and fell into the category of patients with psychogenic-defined anxiety disorders alone causing dizziness.  (Id. at 732.)  He also noted that Hoch had normal neuro-otologic and neurologic evaluations, and concluded that her CSD did not significantly functionally limit her from a neurologic or neuro-otologic perspective.  (Id.)  Dr. King further noted that, during surveillance, Hoch drove, had no limitation in her neck movement, and no difficulty walking or ascending and descending stairs.  (Id. at 732.)  Dr. King concluded that Hoch's neck pain and cervical degenerative disease did not preclude her from light level work and that the surveillance did not show limitations in that regard.  (Id. at 733.)  Dr. King also found that the medical record did not support Hoch's claim that she was having frequent migraines or that they rose to the level that would preclude her from light level work.  (Id. at 733.)  Finally, he concluded that Hoch was not precluded from light level work, but believed she should take dizziness precautions such as not working at heights or around heavy machinery or dangerous equipment.  (Id. at 733-34.)

L.     **Hartford Denies Hoch's Appeal; Hoch Files Lawsuit**

In a letter dated September 4, 2008, Hartford denied Hoch's appeal and reiterated its decision to deny Hoch her LTD benefits.  (Id. at 714.)  Hartford noted the following conclusions of numerous independent physicians:  1) Dr. Rigaud found no psychiatric rationale to restrict Hoch's daily activities, (id. at 718); 2) Dr. Varpetian concluded that Hoch had no physical limitation to working full-time if she could alternate sitting with periods of standing, walking or stretching, (id.); 3) Dr. Lurie concluded that there were no functional limitations or restrictions from a psychiatric standpoint and that there was no evidence that her use of prescription

16

medications limited her ability to work, (id. at 719); 4) Dr. Jankowiak concluded that Hoch could

perform sedentary level work, but she should not climb or work at heights or near dangerous

equipment or heavy machinery, (id. at 719); 5) Dr. King concluded that Hoch was not precluded

from light duty work, but she should have dizziness precautions at work (id. at 721); and 6) Dr.

Smith opined that there was "no support for [Hoch's] functional limitations due to a

mental/emotional disorder based on her review of the material provided that was dated through

1/08," (id. at 723).  Hartford also noted that its Assessment identified several sedentary level

occupations which Hoch could perform.  (Id. at 725.)  Based on all of this information, Hartford

concluded that Hoch was functionally capable of performing full-time work at the light level.

(Id. at 725.)

On October 8, 2008, Hoch filed this action in this Court, alleging that Hartford's denial of

her LTD benefits was arbitrary and capricious in violation of the Employee Retirement Income

Security Act, 29 U.S.C. § 1001 et. seq. ("ERISA").  Both parties filed Cross-Motions for

Summary Judgment on February 23, 2009.

## II.    STANDARD OF REVIEW

Deciding Hartford's Motion for Summary Judgment requires the Court to consider two

standards of review:  the summary judgment standard pursuant to Federal Rule of Civil

Procedure 56, and the arbitrary and capricious standard under ERISA.  Byrd v. Reliance Std. Life

Ins. Co., No. 04-2339, 2004 U.S. Dist. LEXIS 24682, at *6 (E.D. Pa. Dec. 7, 2004).

## A.    Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

proper if there is "no genuine issue as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325 (1986)).  Further, the non-moving party has the burden of producing evidence to establish prima facie each element of its claim. Celotex, 477 U.S. at 322-23.  If the Court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

**B.    ERISA Standard**

Hoch's allegation that Hartford illegally denied her LTD benefits raises a separate standard of review under ERISA.  Where, as here, an insurance policy vests discretion in an

insurance company with a dual status as administrator and payer of benefits, the Court must review the determination under an arbitrary and capricious standard.  See e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-12 (1989).

Under the arbitrary and capricious standard, the Court may not reverse the administrator's decision denying disability benefits unless that decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (internal quotations omitted).  The scope of this review is narrow and the Court is not free to substitute its own judgment for that of Hartford's plan administrator in determining eligibility for plan benefits.  Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997).  In short, the arbitrary and capricious standard of review provides an "uncommon privilege in the American legal system – a limited right to be wrong . . . without being reversed." Maurice Rosenberg, Judicial Discretion of the Trial Court:  Viewed from Above, 22 SYRACUSE L. REV. 635, 649 (1971).

In Metro. Life Ins. Co. v. Glenn, the Supreme Court addressed the situation where a plan governed under ERISA provides the administrator with discretionary authority to determine benefit eligibility.  128 S. Ct. 2343, 2346 (2008).  In Glenn, the Court stated that its decision was an "elucidation"of the Firestone standard.  Id. at 2353.  The Court first noted that it held in Firestone that a conflict should "be weighed as a factor in determining whether there is an abuse of discretion."  Id. at 2350 (internal quotations omitted).  The Court explained that "[w]e do not believe that Firestone's statement implies a change in the standard of review, say, from deferential to de novo review."  Id.  "Nor, would we overturn Firestone by adopting a rule that in practice could bring about near universal review by judges de novo . . . ."  Id.  The Court added

that "[h]ad Congress intended such a system of review, we believe it would not have left to the courts the development of review standards but would have said more on the subject." Id.  The Court further explained that "[w]e believe that Firestone means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." Id. at 2351.  The Court added that "[i]n such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tie breaking factor's inherent or case-specific importance." Id. at 2351.

Several months after the Supreme Court's decision in Glenn, the Third Circuit stated, in a non-precedential opinion, that "under Glenn, a plan administrator's conflict of interest would not give rise to a heightened version of the arbitrary and capricious standard of review; instead, that conflict would represent one of several factors that informed the inquiry as to whether the administrator abused its discretion." Michaels v. Equitable Life Assur. Soc'y of the U.S. Emples., Managers, & Agents Long-Term Disability Plan, No. 07-4256, 2009 U.S. App. LEXIS 76, *15-*17 (3d Cir. Jan. 5, 2009) (citing Glenn, 128 S. Ct. at 2351).

Although the parties initially disputed whether the heightened, "sliding scale" version of the arbitrary and capricious standard of review could still be used in light of Glenn, the Third Circuit's recent precedential decision in Schwing v. Lilly Health Plan has put that dispute to rest. Schwing held:

> [O]ur 'sliding scale' approach is no longer valid.  Instead, courts reviewing the decisions of ERISA plan administrators . . . should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.

No. 06-4671, 2009 U.S. App. LEXIS 7871, at *5-*6 (3d Cir. Apr. 14, 2009).

Accordingly, this Court shall follow Schwing and consider the conflict of interest here as one factor among several other factors in analyzing Hartford's decision to terminate Hoch's benefits.  In addition to structural factors such as a conflict of interest, this Court shall also consider procedural factors such as: 1) whether Hartford exercised "self-serving selectivity in the use and interpretation of physicians' reports," Post v. Hartford Ins. Co., 501 F.3d 154, 165 (3d Cir. 2007); 2) whether Hartford based its negative decision on inadequate information and incomplete investigations, Friess v. Reliance Std. Life Ins. Co., 122 F. Supp. 2d 566, 574 (E.D. Pa. 2000); 3) whether Hartford disagreed with the SSA as to whether Hoch was disabled, Glenn v. Metro. Life Ins. Co., 461 F.3d 660, 669 (6th Cir. 2006); 4) whether Hartford reversed an earlier decision allowing benefits without any new evidence supporting the reversal, Post, 501 F.3d at 165; and 5) whether Hartford engaged in a pattern of being overly aggressive in its attempts to reduce benefits, id. at 165-67.

## III.    DISCUSSION

## A.    Structural Factors

While the "sliding scale" standard of review is no longer valid in light of Schwing, the structural factors that warranted heightened scrutiny under that standard continue to be relevant in determining whether Hartford abused its discretion.  These factors include:  1) conflict of interest; 2) the sophistication of the parties; 3) accessibility of information; and 4) the financial status of the administrator.  See Post, 501 F.3d at 166.

The Supreme Court in Glenn stated:

The conflict of interest . . . should prove more important (perhaps of great

> importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Glenn, 128 S. Ct. at 2351 (internal citations omitted).  In bringing a claim under ERISA, the plaintiff bears the burden of proving that a conflict exists and that the court should afford the plan administrator less deference.  See Kelly v. Conn. Gen. Life Ins. Co., No. 03-315, 2003 U.S. Dist. LEXIS 21025, at *7-*8 (E.D. Pa. Nov. 7, 2003); Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 617 (E.D. Pa. 2003).

It is clear that, because Hartford both determines eligibility for and pays LTD benefits, a conflict of interest exists.  The question then is the amount of weight this Court should place on the conflict of interest factor.  As Hoch points out, Hartford does have a history of at least one instance of biased claims administration, as evidenced by this Court's decision in Post v. Hartford Ins. Co., No. 04-3230, 2008 U.S. Dist. LEXIS 76916 (E.D. Pa. Oct. 2, 2008).  Other than our decision in Post, however, Hoch has not presented any other instances of biased claims administration on the part of Hartford.  Moreover, other than the fact that Hartford both determines eligibility for and pays LTD benefits, Hoch has presented no evidence that the individuals making the benefit determinations at Hartford have any involvement in the funding of the Plan.  The Court shall therefore assign neither "great importance" to Hartford's conflict, nor de-emphasize it "to the vanishing point," but rather, treat it as one relevant factor in our analysis of whether Hartford abused its discretion.

22

As to the sophistication of the parties, although Hoch lacked knowledge of the legal intricacies of ERISA, she was represented by counsel during most, if not all, of the claim process. See Post, 2005 U.S. Dist. LEXIS 22511, at *30-*31.  Further, the record does not indicate that the exchange of information was hindered by Hartford.  On the contrary, Hartford conscientiously attempted to keep Hoch apprised of the information it had at its disposal and the reasons for its decisions regarding Hoch's LTD benefits.  (R. at 751; 2-14; 1482-86, 453-55; 1171-77.)  Finally, the record is void of any information regarding Hartford's financial condition, thus this factor does not affect our analysis.

**B.      Procedural Factors**

**1.      Whether Hartford Exercised Self-Serving Selectivity in its Use and Interpretation of Physician Reports**

At Hartford's request, six independent physicians reviewed Hoch's claim, three of whom are experts in physical medicine, and three of whom are experts in psychiatric medicine.  All six physicians concluded that Hoch is capable of full-time sedentary level work with certain restrictions.  In April 2007, Dr. Rigaud "found no objective evidence to support severe psychiatric functional limitations that would prevent [Hoch] from working" (R. at 1503), and Dr. Varpetian concluded there was no evidence of a balance deficit or any other physical barrier to Hoch returning to a full-time occupation, (id. at 1505).  Dr. Varpetian also believed that Hoch could lift or carry up to twenty pounds occasionally and ten pounds frequently, (id. at 1505), and sit for up to eight hours if she were allowed to alternate sitting with periods of standing, walking or stretching, (id. at 1506).  In January 2008, Dr. Jankowiak concluded that Hoch had no significant neurological impairment that would hinder her functioning, and she could perform

full-time sedentary level work, with restrictions.  (Id. at 1124-25.)  In the same month, Dr. Lurie

found that Hoch's psychiatric conditions were "mild and not functionally limiting."  (Id. at

1208.)  In September 2008, Dr. Smith concluded that there was nothing "from a Psychiatric point

of view that would preclude [Hoch from] functioning in the workplace if she were motivated to

do so."  (Id. at 743.)  In fact, Dr. Smith opined such activity would "very likely benefit her

overall condition."  (Id.)  In the same month, Dr. King concluded that neither Hoch's CSD nor

any of her other prior conditions noted in the record precluded her from light level work, with

restrictions, from a neurologic or neuro-otologic perspective.  (Id. at 733-34.)

       In Hoch's appeal letter to Hartford dated October 26, 2007, Hoch's counsel states "Dr.

Lawlor – Hoch's long-time internist and family doctor – in response to your March 6, 2007

[letter], disagreed that Hoch is 'capable of performing work at the light capacity level.'"  (Id. at

992.)  Hoch's appeal letter further states that, in a note dated March 23, 2007, Dr. Lawlor

concluded that Hoch is "unable to return to work due to sudden and unpredictable bouts of severe

dizziness."  (Id.)  However, during a conversation with Dr. Jankowiak on January 16, 2008, Dr.

Lawlor stated that he last saw Hoch for a preoperative evaluation for bunion surgery

approximately two months prior to their conversation, and that he had not made note of the

frequency of these spells and was not sure if they were still present.  (Id. at 976.)  Dr. Lawlor

stated that the last time Hoch mentioned her dizziness to him was during a visit on March 23,

2007.  (Id. at 1123.)  Dr. Lawlor further opined that if Hoch's dizzy spells had resolved, he could

see no other reason why she could not return to work.  (Id. at 975.)

       Since Hoch's June 2, 2005 accident, Hoch treated with numerous physicians in addition

to Dr. Lawlor, including Drs. Odgers, Graham, Bernstein, Irfan, Lee, Ruckenstein, Staab, Chism

and Donnell.  In the extensive record before the Court, none of these doctors opined that Hoch

could not work at the sedentary level on account of her CSD.  In fact, one of Hoch's treating

doctors, Dr. Lee, agreed with Hartford's assessment that Hoch could perform light level physical

demand work.  (R. at 53.)  Only Dr. Staab came close to expressing an opinion that Hoch could

not work at the sedentary level on account of her CSD, stating that in order for her to work at the

sedentary level, she would need to take fifteen minute breaks every hour.  Because of the

required breaks, Dr. Staab advised her not to return to work.  (Id. at 1211.)  Hartford, however,

took the required breaks into account when creating its Assessment of Employability for Hoch.

(Id. at 25-26; 1092.)  As already discussed, the Assessment identified at least seven occupations

within the national economy that met the required wage earnings under the Policy, and that

required skills or traits which Hoch possessed and which were within her physical, mental and

cognitive abilities.  (Id. at 1093-94.)

       In Black & Decker Disability Plan v. Nord, the Supreme Court stated:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's
> reliable evidence, including the opinions of a treating physician.  But, we hold,
> courts have no warrant to require administrators automatically to accord special
> weight to the opinions of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit reliable evidence
> that conflicts with a treating physician's evaluation.

538 U.S. 822, 834 (2003); see also Addis v. Ltd. Long-Term Disability Program, 425 F. Supp. 2d

610, 617 (E.D. Pa. 2006) ("[I]f the consultant's conflicting opinion is based on reliable evidence,

it can support a determination contrary to that of a treating physician . . . ."); Forchic v.

Lippincott, Jacobs & Gruder, No. 98-5423, 1999 U.S. Dist. LEXIS 21419, at *4 (D.N.J. Nov. 29,

1999), aff'd, 262 F.3d 403 (3d Cir. 2001) ("[I]t is not improper to rely on the opinions of

nonexamining physicians who had before them the entire record of medical evidence, more evidence than was available to any one doctor who saw plaintiff previously."); Etkin v. Merk & Co., No. 00-5467, 2001 U.S. Dist. LEXIS 17692, at *15-*16 (E.D. Pa. Oct. 30, 2001); Post, 501 F.3d at 166.  To the extent that Dr. Staab's opinion constitutes a contradiction of the opinions of the numerous independent reviewing physicians who concluded that Hoch can perform full-time sedentary level work with restrictions, courts in this Circuit have repeatedly held that an ERISA plan administrator does not abuse its discretion by resolving conflicts in medical records and concluding that a plaintiff is not disabled.  See Nichols v. Verizon Communs., 78 Fed. Appx. 209, 212 (3d Cir. 2003) (upholding benefit determination where administrator resolved conflict between treating physician and independent reviewing physician); see also Schlegel, 269 F. Supp. 2d at 625-28 (granting summary judgment to administrator where it resolved competing medical records and concluded that plaintiff was not eligible for LTD benefits); Conti v. Equitable Life Assurance Soc. of the U.S., 227 F. Supp. 2d 282, 291-93 (E.D. Pa. 2002) (same); Sapovits v. Fortis Benefits Ins. Co., No. 01-3628, 2002 U.S. Dist. LEXIS 24987, at *43, *51 (E.D. Pa. Dec. 30, 2002) (same); Etkin, 2001 U.S. Dist. LEXIS 17692, at *6 (same); Forchic, 1999 U.S. Dist. LEXIS 21419, at *44 (same); Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 407-09, 411 (D. Del. 2001), aff'd, 288 F. 3d 78 (3d Cir. 2002) (same); Marques v. Reliance Std. Life Ins. Co., No. 99-2033, 1999 U.S. Dist. LEXIS 17406, at *12-*17 (E.D. Pa. Nov. 1, 1999) (same); Sciarra v. Reliance Std. Life Ins. Co., No. 97-1363, 1998 U.S. Dist. LEXIS 13786, at *33-*35 (E.D. Pa. Aug. 26, 1998) (same).

　　　To summarize the record before the Court:  1) six independent reviewing physicians found that Hoch is capable of full-time work, with restrictions, at either the light or sedentary

level; 2) at least seven of Hoch's treating physicians did not opine in the record before the Court as to whether Hoch could work full-time at the sedentary level; 3) Dr. Lee, a treating physician, agreed with Hartford's assessment that Hoch could perform light level work; 4) Dr. Lawlor disagreed with Hartford's assessment that Hoch could perform light level work, but stated that he had last seen Hoch in November 2007, and she last complained of dizziness during their March 23, 2007 visit, therefore he did not know if she was continuing to suffer from that symptom; and 5) Dr. Staab stated that, in order for Hoch to work at the sedentary level, she would need to take fifteen minute breaks every hour.  Thus, viewing the record as a whole, it does not appear to the Court that Hartford exercised self-serving selectivity in its use and interpretation of physician reports.

**2.      Whether Hartford Based its Decision to Deny LTD Benefits on Inadequate Information and Incomplete Investigations**

As already discussed, Hoch treated with Dr. Chism from March 2008 to August 2008, and has treated with Dr. O'Donnell from August 2008 to the present.  Hoch's counsel informed Hartford of this in the first of a series of letters dated August 27, 2008.  (R. at 754-55.)  In that letter, Hoch's counsel attached Dr. Chism's medical records from March 2008 to August 2008. (Id.)  On the same day, an appeal specialist for Hartford replied in a letter to Hoch's counsel, stating in relevant part:

> A copy of the records has been sent to our vendor for forwarding to the reviewing physicians.  You advised you were in the process of obtaining any and all new records from Dr. O'Donnell . . . . Would you like us to put the appeal in incomplete status at this time awaiting the records from Dr. O'Donnell or would you prefer to have the reviewing physicians completed [sic] their report based on the medical documentation they have now received.

(Id. at 751.)  On that same day at 2:15 p.m., Hartford sent an email to University Disability

Consortium ("UDC"), stating in relevant part:

> [A]ttached is some additional medical information the attorney faxed to me . . . .
> The attorney has advised that the telephone number for the office where Ms. Hoch
> is treating is . . . good luck with this number as I have been trying to get a live
> person now for quite some time with no success . . . . Please pass this information
> on to Drs. King and Smith for review.  As soon as I get the additional medical
> [records] (Dr. O'Donnnell [sic]) from the attorney[,] I'll sent [sic] it along to you
> so that the doctors can complete their report.

(Id. at 752.)  In another letter dated August 27, 2008, Hoch's counsel stated:

> [T]he records I faxed to you this morning from Dr. Chism merely serve as a
> supplement to the appeal letter my office previously sent to you on July 2, 2008.
> The severity and makeup of my client's illness (i.e. CSD) have been longstanding;
> the new records merely reinforce this.  As such, your physicians have more than
> enough to complete their report based on the medical documentation they have
> now received.  Kindly make your decision regarding this July 2, 2008 appeal as
> soon as possible.

(Id. at 748.)  On that same day at 3:58 p.m., Hartford sent another email to UDC, stating in

relevant part:

> I have just heard back from the attorney who advised that the records from Dr.
> Chism merely served as a supplement as the severity and makeup of Ms. Hoch's
> illness (CSD) has been longstanding and the new records merely reinforced this.
> Please have the reviewing physicians submit their reports using the medical
> documentation they have.

(Id. at 745.)

Hoch asserts that "Hartford has ignored all medical records pertaining to Plaintiff's CSD

and the opinions of all treating physicians for the CSD since March 2008 . . . . In addition, there

is no evidence that any of Hartford's commissioned doctors ever attempted to contact Dr. Chism

or Dr. O'Donnell."  (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 6 (emphasis deleted).)  To

support her assertion, Hoch argues that Dr. King did not specifically mention Dr. Chism's

records, and that Dr. Smith's September 2, 2008 record review states, "I did not review any

material dated subsequent to January 2008." (Id. at 708.)

Hartford argues, however, that "upon receipt of the records from plaintiff's counsel, Hartford took the steps necessary to forward them to Drs. King and Smith for their review," citing its August 27, 2008 letter to Hoch's counsel and an internal log entry dated August 27, 2008 at 2:32:59 p.m., stating "[a]dditional medical information sent to UDC." (Def.'s Mem. Supp. Resp. Pl.'s Mot. Summ. J. at 13.) Hartford argues that "[a]lthough Dr. Smith wrote that she had not reviewed any records beyond January, 2008, it is possible that she did not modify this statement after receiving Dr. Chism's records, because they were received after the rest of plaintiff's claim file had been sent to her." (Id. at 14, n.17 (citations omitted).) Hartford states that "[t]he record is also clear that Dr. King considered these records, because he wrote that he reviewed records from the University of Pennsylvania Health System, Psychiatry Department, of which Dr. Chism was a part." (Id. at 13.)

In Glenn, the Supreme Court held that when a plan administrator "fails to provide its independent vocational and medical experts with all of the relevant evidence" such conduct constituted a "serious concern." Glenn, 128 S.Ct. at 2352. Here, however, assuming that Hartford did in fact fail to provide Drs. Smith and King with Dr. Chism's records, none of these records appear to reveal any significant information regarding Hoch's condition during this time period, other than to note that she was experiencing dizziness, with a depressed mood and dysphoric affect. (R. at 756-61.) These facts were all contained in several other medical records throughout Hoch's claim file. Further, upon examining Hartford's first email to UDC, it appears that Hartford did attempt to contact Hoch's treating physician at the telephone number provided by Hoch's counsel, but was unable to reach a "live person."

29

Finally, it is clear from the above correspondence that the records from Dr. O'Donnell were never forwarded to Hartford.  The burden to supply all documents Hoch wished to be considered as part of her claim on appeal rested entirely with Hoch – not with Hartford.  See Fabyanic, 2009 U.S. Dist. LEXIS 21777, at *21-*22.

Because it is clear that Dr. Chism's records offered no substantive evidence that was not already contained many times over in the record, this Court is unable to assign any substantial weight to the argument that Hartford based its decision to deny LTD benefits on inadequate information and incomplete investigations.

**3.     Whether Hartford Disagreed with the SSA's Determination that Hoch was Disabled**

As already discussed, on August 24, 2006, an ALJ held that Hoch had been under a "disability" as defined by the Social Security Act since July 11, 2005, and that she is entitled to SSD benefits.  (R. at 934-40.)  The Third Circuit in Post held that "a disagreement is relevant though not dispositive, particularly (as here) when the administrator rejects the very diagnoses on which the Social Security benefits determination is based."  501 F.3d at167.  However, "[w]hile an SSA award may be considered as a factor in determining whether an ERISA administrator's decision to deny benefits was arbitrary and capricious, it 'does not in itself indicate that an administrator's decision was arbitrary and capricious, and [] a plan administrator is not bound by the SSA decision.'"  Brandeburg v. Corning Inc. Pension Plan for Hourly Emples., 243 Fed. Appx. 671, 674 n.3 (3d Cir. July 16, 2007) (quoting Dorsey v. Provident Life & Accident Ins. Co., 167 F. Supp. 2d 846, 856 n.11 (E.D. Pa. 2001)).  This is because the SSA has very different guidelines for determining disability than does the Policy in this case.  See Cefalo v. Smithkline Beecham Corp., No. 00-172, 2000 U.S. Dist. LEXIS 22140, at *28 n.49 (W.D. Pa. Aug. 30,

2000) ("[Defendant] was not bound by the Social Security Administration's . . . determination that the plaintiff was 'disabled,' since the SSA standards are neither incorporated into the Plan, nor similar to the Plan's definition of 'totally disabled.'").

Here, although Hartford did not specifically mention the ALJ's award in its final denial letter, Hartford explained that its decision was based upon all of the documents in Hoch's file, (R. at 714) and Hoch's file included notes of Hoch's progress before the ALJ and Hoch's award of SSD benefits, (id. at 253; 261). More importantly, the August 24, 2006 SSA ruling occurred before: 1) Hartford conducted surveillance on Hoch; 2) Hoch ever visited with Drs. Irfan, Ruckenstein, Staab, Chism or O'Donnell; 3) Dr. Lee agreed with Hartford that Hoch was capable of light level work; 4) Drs. Rigaud, Varpetian, Jankowiak, Lurie, Smith and King concluded that Hoch was at least capable of working at the sedentary level; 5) Hoch was diagnosed with CSD; and 6) Dr. Lawlor opined that if Hoch's dizzy spells had resolved, he could see no other reason why she could not return to work. The only impairments mentioned in the SSA's "Findings of Fact" are "degenerative disc and joint disease and legal blindness of the left eye." (R. at 334.) Therefore, it cannot be said that Hartford rejected "the very diagnoses on which the Social Security benefits determination is based." In light of the above, the fact that Hartford disagreed with the SSA's determination that Hoch was disabled is a relevant factor, but not one on which this Court can place any substantial weight.

**4.     Whether Hartford Reversed an Earlier Decision Allowing Benefits Without Any New Evidence Supporting Reversal**

As already discussed, Hartford reinstated Hoch's benefits retroactive to May 5, 2007 on January 25, 2008. Then, on April 2, 2008, Hartford advised Hoch that it completed its review of

her claim under the Any Occupation standard and determined that she did not meet the Policy

definition of "disability" beyond March 31, 2008.  Hoch argues that Hartford reversed its

position allowing benefits without additional new evidence and based its decision solely on

record reviews which contradicted the conclusions of Hoch's treating physicians.  (Pl.'s Mem.

Supp. Mot. Summ. J. at 22.)  In response, Hartford points out that Hoch received benefits under

the Own Occupation standard because the medical evidence supported her inability to perform

the duties of her own light level occupation as a parts counterperson.  However, the medical

evidence no longer supported her entitlement to benefits when the standard for receiving benefits

became more stringent, requiring Hoch to be unable to perform *any* occupation.  As already

discussed, the reports of numerous physicians established that Hoch's physical and mental

conditions do not preclude her from full-time sedentary level work with certain restrictions.

Courts in this Circuit have repeatedly upheld an administrator's termination of LTD

benefits when the test changed from "own occupation" to "any occupation" because the standard

for continued payment of benefits is more rigorous under the "any occupation" test.  See Marx v.

Meridian Bancorp, Inc., No. 99-4484, 2001 U.S. Dist. LEXIS 8655 (E.D. Pa. June 21, 2001),

aff'd, 32 Fed. Appx. 645 (3d Cir. Mar. 27, 2002), cert. den., 537 U.S. 885 (2002) (denying

additional LTD benefits under "more stringent" any occupation standard); Cefalo, 2000 U.S.

Dist. LEXIS 22140 (same); Russell v. Alcoa, Inc., No. 06-1459, 2008 U.S. Dist. LEXIS 28831

(M.D. Pa. Mar. 31, 2008) (same); Johnson v. Lucent Techs., Inc., No. 00-3708, 2001 U.S. Dist.

LEXIS 6452 (E.D. Pa. May 15, 2001), recons. den., No. 00-3708, 2001 U.S. Dist. LEXIS 10886

(E.D. Pa. July 12, 2001) (same).  In light of the test change which occurred between Hartford's

reinstatement of Hoch's benefits and Hartford's second termination of Hoch's benefits, this

Court does not find Hoch's assertion that Hartford reversed its earlier decision allowing benefits without any new evidence supporting reversal to be of much relevance in Hoch's case.

**5.      Whether Hartford Engaged in a Pattern of Being Overly Aggressive**

Hoch argues that the "video surveillance which confirms Plaintiff rarely leaves her home because of her illness, only demonstrates Hartford's consistently aggressive attitude towards Plaintiff after initially granting Plaintiff benefits in January 2006." (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 7.) As the Third Circuit stated in Post, "while surveillance is an aggressive tactic, nothing prohibits its use." 501 F.3d at 166-67. In Post, the Third Circuit found it "bothersome" that "Hartford continued to investigate [Post's] claim despite its surveillance revealing that she did not leave her home." Post, 501 F.3d at 167. The court went on to state that "the very fact that its employees characterized the results of the surveillance as 'unsuccessful' suggests that its motive was to find evidence to deny Post's claim." Id. This is the not the case here.

While Hoch points out that "there is only 27 minutes of Plaintiff over the four days (October 2-3, 25-26) surveillance was conducted," (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 7), the evidence obtained does not show that Hoch is housebound. As already discussed, over the course of four days, Hoch was observed walking her dog, carrying her dog, carrying two large cardboard boxes, driving with a young child, bending over to speak with a child, and remaining in a department store with two young children for twenty minutes, all in a normal, unrestricted fashion without braces or aides. Further, after viewing the surveillance, Dr. Lee, one of Hoch's treating doctors, agreed with Hartford that Hoch was capable of light level work. However, in the month prior to the surveillance, Hoch completed a Claimant Questionnaire for

33

Hartford, claiming that she experienced severe pain in her left foot when she walked for more than five minutes and that she continued to have intermittent pain three to four days a week in her neck.  Hoch further indicated that she could not bend down much or carry or pick up her grandchildren without severe pain in her neck, back and foot after three to four minutes.  Finally, Dr. Smith stated that a person claiming symptoms as severe as those claimed by Hoch should be motivated to seek more intensive treatment than Hoch had ever sought, would not repeatedly flip her hair from side to side and would not drive with a young child in her car.  (R. at 742-43.)

Therefore, while conducting surveillance is an aggressive tactic, this Court cannot say that Hartford engaged in a pattern of being overly aggressive in light of the contrast between the evidence obtained through surveillance and the information that Hoch provided in the Claimant Questionnaire approximately one month earlier.

## IV.    CONCLUSION

After weighing the above-mentioned factors, considering all of the medical evidence, examining the apparent contradictions in the record between Hoch's reported symptoms and her actual conduct, and viewing all reasonable inferences in favor of Hoch, this Court finds that there is no genuine issue as to any material fact which would show that Hartford's decision to terminate Hoch's LTD benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Abnathya, 2 F.3d at 45.  Therefore, Hartford's decision must be upheld.

An appropriate Order follows.